IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 25, 2015

**STATE OF TENNESSEE v. WILLIAM DAVIDSON HAMBY, JR.**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2652     Monte Watkins, Judge**

_____

**No. M2014-00593-CCA-R3-CD - Filed April 27, 2015**

_____

The defendant, William Davidson Hamby, Jr., was convicted after a bench trial of aggravated kidnapping, a Class B felony, and he was sentenced to serve fourteen years in prison. On appeal, the defendant challenges the sufficiency of the convicting evidence. He also asserts that the trial court erred in not ordering a second evaluation of his competency after he initially refused to attend his own trial. After a thorough review of the record, we conclude that the evidence is sufficient to support the verdict and that the trial court's failure to order a second evaluation was not error, and we accordingly affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Frank McLeod (at trial) and Richard C. Strong (on appeal), Nashville, Tennessee, for the appellant, William Davidson Hamby, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTUAL AND PROCEDURAL HISTORY

On July 8, 2012, the defendant struck his ex-girlfriend in a parking lot and forced her to come upstairs and into his apartment against her will. He was subsequently arrested and remained in jail, where he committed numerous disciplinary infractions, including flooding his cell and throwing feces.

On the morning of the October 14, 2013 trial, the defendant refused to come to the courtroom or participate in the trial. In the course of arguments about the feasibility of ordering the defendant's appearance, the prosecution suggested the defendant was obstructing the judicial process, citing a phone conversation before an earlier court date where the defendant had told a relative, "I know how to get this thing continued for a month or so." The prosecution also stated for the record that the defendant had been evaluated by a mental health professional and found "competent and sane." Defense counsel agreed that the defendant had been evaluated but requested a further mental examination, asserting that "[i]n light of this new episode by [the defendant], he needs to be re-evaluated." During the discussion regarding the forced appearance of the defendant, defense counsel referenced the defendant's history of mental illness but stated that the defendant had consulted with him the previous day about trial strategy and had decided to waive his right to a jury trial by asking the judge to try his case. The trial court noted that the defendant could have been referring to new legal representation in the comment regarding a continuance. The court questioned whether it could "override medical staff, with regard to ordering one to appear in a particular place." Before taking a recess, the trial court found that the defendant had been "quite lucid and … understood everything" at a court appearance approximately two weeks prior to the trial.

The record does not reflect any concrete details regarding the events of the morning nor does it reveal the manner in which the defendant's initial refusal to participate was resolved. The transcript merely resumes with the appearance of the defendant, who waived his right to a jury trial, and with the presentation of evidence.

The victim, Melissa McComb, testified that she had a history of crack addiction after losing a child in 1993. The defendant was her ex-boyfriend, and they had spent some time at a motel together a few weeks prior to July 8, 2012, but at the time of the crime, they were no longer romantically involved.

The victim had been smoking crack with Peter York, a friend, the night before the July 8, 2012 kidnapping. That morning, they were planning to do drugs, and she and the defendant had been exchanging text messages. Mr. York and the victim picked the defendant up off the street in front of his apartment complex. Both the victim and the defendant bought

drugs. The victim testified that on the way to the defendant's apartment, she was in the back seat and the defendant was in the passenger's seat of the two-door vehicle. As they approached the defendant's apartment, the defendant kept asking her if she was coming in, but she did not respond because she did not want to go in or to anger him by refusing to go. When they arrived, she got out of the back of the car so that she could get into the front seat. The defendant accused her of having a relationship with Mr. York. The victim refused to go into the defendant's apartment. After her refusal, the defendant struck her in the face, grabbed her arm, and began to walk up to his apartment with her. She could taste blood after the defendant hit her. The victim testified she wanted to leave but was afraid he would hit her again if she broke away.

When they entered the apartment, the defendant showed her a ten- to eleven-inch knife, and she saw a larger knife under the couch. They went to the bedroom, she produced the crack, and they smoked it. The victim testified that the defendant forced her to remain in the apartment but did not force her to smoke crack. The victim later heard a knocking at the door, and the defendant looked outside and said it was the police. He walked her into the bathroom, opened the shower curtain, and told her to get in the bathtub and be quiet. The victim overheard him tell officers that no one else was there, and she coughed loudly in the hope of being heard.

Mr. York confirmed that he and the victim had been together prior to the kidnapping, doing drugs. However, Mr. York denied being under the influence of drugs at the time of the offense. Mr. York testified that he and the victim had been in contact with the defendant by phone and that they then picked him up. They made two stops, and the "main outcome" was to "score drugs." Mr. York testified that the purpose of contacting the defendant was not to acquire drugs and that Mr. York could get his own drugs. According to Mr. York, the victim was in the passenger's seat and the defendant in the back seat. When they pulled into the defendant's parking lot to drop him off, the victim did not want to get out. Mr. York testified he did not want the victim to go with the defendant because the defendant had threatened to kill her. The victim raised the car seat to allow the defendant to get out. Mr. York testified that the defendant went out through the passenger's side door of the two-door vehicle and that there was a struggle during which the victim tried to shut the door. The defendant forced her out of the car, and he struck her in the face and "busted" her face open. The two went up to the apartment.

Mr. York called 911 at 8:20 a.m. on July 8, 2012. The recording of the call was played in court. During the call, Mr. York told the operator that a man had just "busted" a woman's face, tried to drag her into his house, and had threatened to kill her. He gave the number of the apartment unit that the defendant and victim had gone into and told the operator that the defendant had knives in his home.

-3-

Mr. York testified that he had not been in the defendant's apartment that day but had been there three to four days earlier, doing drugs. Mr. York acknowledged having a shoplifting conviction, numerous prior arrests, and mental health issues including diagnoses of bipolar disorder, post-traumatic stress disorder, and schizoaffective disorder, for which he was on medication.

Officers arrived on the scene shortly after the 911 call and spoke to Mr. York. Officer Joe Pennington testified that he saw blood on the ground where the assault had occurred and saw a trail of blood leading to a third floor apartment. Officer Pennington and Officer John Pryor both testified that they knocked on the door for several minutes and received no response. Eventually, the defendant opened the door. He was shirtless, and both officers testified he was sweating and had recent injuries to his hand. The defendant stated that no one else was in the apartment and that he had not been in an altercation, and he denied the police entry.

Because the police were concerned for the safety of the victim, Officer Pennington grabbed the defendant and detained him against an outside wall while Officer Pryor entered the home. As police were entering the apartment, the defendant admitted that someone else was inside. Officer Pryor testified that the victim was "hunkered down" in a bathtub with a cut over her eye and blood coming down her face. Both officers testified that the victim appeared to be very frightened. Officer Pennington testified that the victim gave him a false name but that she told him her real name at the scene after he checked the information. Officer Pennington saw a knife with a blade over six inches long propped by the door. The knife had cardboard and tape on the handle to improve the grip, and there was another knife in the kitchen. Officer Pennington stated that police entered the apartment after his sergeant arrived and that a Computer-Aided Dispatch ("CAD") report which showed that his sergeant was not on the scene until 10:35 would not have been accurate because the report depended on an officer manually entering his arrival time.

The victim was taken to a hospital, where her injuries, which required stitches, were photographed at 10:30 a.m. At the hospital, the victim gave Officer Pennington a statement about the kidnapping. At trial, the victim testified that she first gave a false name because she believed that there was a warrant out for her arrest at the time.

Beth Halstead, the court clerk, testified that a warrant for a probation violation was issued against the victim on July 6, 2012, but that it was not entered into the system over the weekend and did not become active until July 9, 2012. The victim was arrested on July 13, 2012, for violating her probation.

The victim testified she received a letter from the defendant while she was in custody,

-4-

offering to pay for plastic surgery for her scar and asking her to tell police she had lied. She sought an order of protection against the defendant when she was released from jail.

The victim acknowledged having prior convictions for joyriding and criminal impersonation. She denied that the defendant took her upstairs to help treat her wound. The victim stated that she was on drugs at the time but denied that her drug usage affected her memory. The victim testified that when she was in the bathtub, she wanted to be found and that she "would rather be in jail than beaten" but that she was not sure if she would be able to get to police if she left the bathroom. She acknowledged having given police a false name when she was pulled over some days prior to the kidnapping.

The trial court found the defendant guilty of aggravated kidnapping. At the sentencing hearing, the defendant's mother, who is a physician, testified regarding his history of drug abuse and his history of mental illness. She stated that the defendant was bipolar and required medication. His mother believed he had a good heart, and she did not believe he committed the crime. The defendant also testified at the hearing, accusing the prosecutor and police officers of lying and falsifying documents and taking issue with the fact that the victim was not immediately arrested after the crime. He referenced certain lawsuits which he believed were the source of a bias in the judicial system. He accused the victim and Mr. York of fabricating the incident and stated the victim had stolen his EBT card. The trial court found that three enhancement factors applied. In mitigation, it found that it was "abundantly clear and obvious that [the defendant] has some serious mental health issues." The trial court sentenced the defendant to serve fourteen years in prison. On appeal, the defendant contends that the evidence was insufficient to support the verdict. He also challenges the trial court's refusal to order a second mental health evaluation after the defendant initially refused to be present at his trial.

## ANALYSIS

### I. Sufficiency of the Evidence

Under Tennessee Rule of Appellate Procedure 13(e), "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." In evaluating the sufficiency of the evidence, the court must determine whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt,

approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). The same standard of review applies to direct and circumstantial evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013).

To prove that the defendant committed the crime of aggravated kidnapping as charged in the indictment, the State was required to show that the defendant knowingly removed or confined the victim so as to interfere substantially with her liberty and that the victim suffered bodily injury. T.C.A. § 39-13-302(a), -304(a)(4) (2010). "Substantial" is defined as "considerable in quantity" or "significantly large." *State v. White*, 362 S.W.3d 559, 576 (Tenn. 2012) (quoting *Webster's Ninth New Collegiate Dictionary* 1176 (1991)).

The defendant's challenge to the sufficiency of the evidence is in effect a request for this court to reevaluate the credibility of the witnesses. The defendant claims that it was "erroneous for the trial court to credit [the victim's] testimony" because she admitted that she had lied about her name both after the crime and during a previous traffic stop. However, the victim's attempts to elude arrest for her violation of probation do not render her incompetent as a witness, and the evaluation of her credibility is entrusted to the trial court and may not be usurped by this court on appeal. *See Bland*, 958 S.W.2d at 659. The trial court credited the victim's testimony, and the testimony of other witnesses and the physical evidence corroborated her account of the crime.

The defendant also contends that the victim was not confined against her will because rather than leaving the apartment after the defendant assaulted her, led her upstairs, and showed her a knife, she instead smoked crack cocaine with the defendant. The victim testified that after she refused to accompany the defendant, he struck her hard enough to cause significant bleeding and leave a wound that required stitches. He then took her by the arm and led her upstairs. Mr. York witnessed both the assault and the kidnapping, and he testified the defendant had previously made threats that he would kill the victim. The police found a blood trail leading to the defendant's apartment. Once in the apartment, the defendant showed the victim a large knife without comment. At this point, the victim and defendant smoked crack. When the police arrived, the defendant instructed her to hide in the bathtub and remain silent. The victim testified that she attempted to make a sound but was

afraid to come out because she was not certain she would be safe. Both officers testified that the victim had injuries and appeared frightened when she was found, and Officer Pennington saw a large knife by the door.

The victim was not required to attempt to escape and risk provoking the defendant to use the knife in order to demonstrate her desire to leave; the trier of fact was entrusted with deciding whether the defendant substantially interfered with her liberty. *See State v. Cecil*, 409 S.W.3d 599, 608 (Tenn. 2013). The defendant's argument that the victim could have left the apartment instead of smoking crack again asks us to reevaluate the evidence and the credibility of witnesses. We conclude that the proof was sufficient to permit a rational trier of fact to find that the defendant knowingly removed or confined the victim so as to interfere substantially with her liberty and that the victim suffered bodily injury. The defendant is not entitled to relief.

## II. Competency Hearing

The defendant also contends that, after he refused to come to court for his trial, the trial court should have ordered a second mental health evaluation to evaluate his competency. Although the defendant's mental health evaluation is not a part of the appellate record, the parties agree that the defendant was evaluated and found competent. However, the defendant refused to appear in court on the morning of trial, and defense counsel then moved for a new evaluation in light of the recent "episode."

Under the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution, a person who is mentally incompetent may not be put to trial. *State v. Blackstock*, 19 S.W.3d 200, 206 (Tenn. 2000). The federal and state constitutions require that the defendant have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975). In other words, the defendant must have a "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and "'a rational as well as factual understanding of the proceedings.'" *State v. Kiser*, 284 S.W.3d 227, 244 (Tenn. 2009) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

"When it is believed an accused is incompetent to stand trial or waive his or her rights, it is the duty of the court to conduct a hearing for the purpose of inquiring into the competence of the accused, and, where warranted, ordering a psychiatric examination and evaluation of the accused." *Berndt v. State*, 733 S.W.2d 119, 122 (Tenn. Crim. App. 1987) (citing T.C.A. § 33-7-301(a)). A trial court's decision regarding the ordering of an evaluation is reviewed considering only those facts which were before the court at the time

of the trial or the entry of the pleas. *See id.* at 122 (concluding that in evaluating whether a court was required to order an evaluation *sua sponte*, the appellate court should only consider the facts before the trial court at the time). The standard of review is "'[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Kiser,* 284 S.W.3d at 245 (quoting *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir. 1983)). A competency evaluation is only necessary if the evidence warrants a belief that the defendant is incompetent to stand trial. *Kiser*, 284 S.W.3d at 245 (citing *State v. West*, 728 S.W.2d 32, 34 (Tenn. Crim. App. 1986)). This inquiry is fact-dependent, and relevant factors include the defendant's medical history, the opinion of psychiatric experts, and the defendant's behavior at trial. *Kiser*, 284 S.W.3d at 245 (citing *Williams*, 696 F.2d at 466). "'The presence or absence of evidence relating to one of these factors is not conclusive on the ultimate question of whether an evidentiary hearing is needed to insure that the defendant is capable of aiding in the preparation of his or her defense.'" *Id.* at 245-46 (quoting *Williams*, 696 F.2d at 466 n.1). A trial court's findings are conclusive on appeal unless the evidence preponderates otherwise, and the defendant bears the burden of proving incompetence by a preponderance of the evidence. *State v. Reid*, 164 S.W.3d 286, 306, 307 (Tenn. 2005).

To clarify, the defendant does not contend that, based on the information before the trial court, including the evaluation finding him competent, the trial court erred in concluding he was competent to stand trial. Instead, the defendant claims that the trial court erred in not ordering a second evaluation based on the facts before it, thus affording him the opportunity to show he was not competent.

In *State v. Blackstock*, the appellate court concluded that the trial court was entitled to rely upon the psychiatric evaluation finding the defendant competent and that the trial court did not err in not ordering a second hearing when there was no further evidence of incompetence. *Blackstock*, 19 S.W.3d at 206. Likewise, in *Berndt v. State*, the defendant had been evaluated by a mental health professional who concluded he was competent to stand trial. *Berndt*, 733 S.W.2d at 122. The trial judge observed the defendant in the courtroom, and the transcript was "void of any statement or occurrence that would have mandated a *sua sponte* hearing." *Id.* This court concluded that statements in the presentence report indicating that the defendant had psychiatric problems did not mandate a new evaluation. *Id.* at 123. A trial court is not required to order an evaluation absent some indication that the defendant's competency is in question. *See Kiser*, 284 S.W.3d at 249 (concluding that language in psychiatric report that the defendant may not be able to understand, control, or plan his actions did not require an evaluation in light of counsel's representation that the defendant appeared competent and in light of the trial court's own observations); *compare State v. Haun*, 695 S.W.2d 546, 549 (Tenn. Crim. App. 1985) (concluding that trial court

should have ordered a hearing when it was aware that the defendant had a history of mental disorders, the defendant's attorneys stated that he was unable to communicate with them, and the defendant was suicidal); *Kiser*, 284 S.W.3d at 249 n.21 (citing *Odle v. Woodford*, 238 F.3d 1084, 1089-90 (9th Cir. 2001) for the proposition that an extensive history of mental impairment, evidence of impairment from experts and jail records, and evidence that the defendant was missing a piece of his brain the size of a grapefruit required an evaluation of competency).

Prior to the trial date, the defense had obtained a mental health evaluation which showed that the defendant was competent to stand trial. On the morning of trial, the defendant refused to come to court. Defense counsel stated that he had met with the defendant the previous day and that the defendant was able to consult with him regarding the evidence and assist in preparing his defense by choosing a bench trial. *See Mackey*, 537 S.W.2d at 707. The trial court found that the defendant had been lucid during a hearing two weeks prior to the trial date. The defendant's temporary refusal to attend trial is the only indication in the appellate record that there had been any change in his mental health status since the evaluation which found him competent. A refusal to attend trial might be, as the prosecution suggested, equally indicative of a desire to manipulate the judicial system. Considering all the facts and circumstances, including the prior evaluation, trial counsel's representation that the defendant had consulted with him regarding strategy the previous day, and the court's own recent observation of the defendant as "lucid," we cannot conclude that a reasonable judge would "'have experienced doubt with respect to competency to stand trial'" such that the court was required to order a new evaluation. *Kiser*, 284 S.W.3d at 245 (quoting *Bordenkircher*, 696 F.2d at 467); *see also West*, 728 S.W.2d at 34.

The defense points to certain exhibits introduced at sentencing which chronicle the defendant's disruptive and irrational behavior during confinement, and he cites to the trial court's finding during the sentencing hearing that it was "abundantly clear and obvious that [the defendant] has some serious mental health issues." However, we are limited in our review to the evidence before the judge at the time of the decision to deny a second evaluation. *See Berndt*, 733 S.W.2d at 122. Furthermore, the standard for competency is not that the defendant is free from "serious mental health issues" but that he has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense," a standard which a mental health professional found that the defendant had met. *Mackey*, 537 S.W.2d at 707; *see also Wilcoxson v. State*, 22 S.W.3d 289, 305 (Tenn. Crim. App. 1999) (noting that not every defendant with a mental problem is rendered incompetent to stand trial); *State v. Benton*, 759 S.W.2d 427, 428-29 (Tenn. Crim. App. 1988) (noting that competency to stand trial is a different inquiry from insanity at time of the offense). The trial court's finding in mitigation that the defendant had mental health issues is not incompatible with the conclusion that there was no evidence

warranting a second evaluation and that the defendant was competent to stand trial.  We conclude that the trial court did not err in refusing a second evaluation.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE